**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Alexis McCall, | : | Case No. 1:14CV704 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security Administration, | : | **MEMORANDUM AND ORDER** |
| Defendant. | : | |
| | : | |

Plaintiff seeks judicial review of a final decision of the Commissioner denying her application for Supplemental Security Income (SSI) and Disability Insurance Benefits under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 416(i), 423, 1381, *et seq*., and § 405(g).  The parties have consented to the Magistrate entering final judgment in this case pursuant to 28 U.S.C. § 636(c)(1) and FED. R. CIV. P. 73 (Docket No. 15).  Pending are briefs on the merits filed by both parties (Docket Nos.17 & 19) and Plaintiff's Reply (Docket No. 20).  For the reasons set forth below, the Magistrate reverses  the Commissioner's decision and remands this case  pursuant to sentence four of 42 U.S.C. § 405(g).

## I. PROCEDURAL BACKGROUND

On December 18, 2008, Plaintiff filed both her applications for SSI and DIB, alleging disability beginning May 30, 2008 (Docket No. 12, pp. 183-185; 186-188 of 662).  Plaintiff's claims for both SSI and DIB

were denied on June 12, 2009, and upon reconsideration on January 22, 2010 (Docket No. 12, pp. 130-135; 139-144 of 662).  Plaintiff filed a written request for a hearing on June 16, 2010 (Docket No. 12, p. 145 of 662).  On May 20, 2011, a hearing commenced in Cleveland, Ohio, before Administrative Law Judge (ALJ) Dennis LeBlanc, but was rescheduled so that Plaintiff could obtain legal representation (Docket No. 13, pp. 5-14 of 15).  On September 13, 2011, ALJ Frederick Andreas presided over a second hearing in Cleveland, Ohio, at which Plaintiff, represented by counsel Marcia Margolius,  and Vocational Expert (VE) Deborah A. Lee, attended and testified (Docket No. 12, pp. 29; 41 of 662).  The ALJ issued an unfavorable decision on October 7, 2011 (Docket No.12, pp. 29-40 of 662).  The Appeals Council denied review of the ALJ's decision on December 13, 2012, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 12, p. 12 of 662).

## II. FACTUAL BACKGROUND

A. **ADMINISTRATIVE HEARING**

   1. **PLAINTIFF'S TESTIMONY**

Plaintiff testified that she was 29 years old,  six feet tall, and weighed approximately 300 pounds (Docket No. 12, p. 53 of 662).  Plaintiff has a driver's license; however,  a friend drove her to the hearing (Docket No. 12, p. 54 of 662).  Plaintiff is a college graduate; consequently, she has acquired  reading, writing and math skills (Docket No. 12, p. 55 of 662).  Plaintiff testified that she last worked for two years at a car dealership in Houston, Texas, but lost the job after getting sick, having her hours cut back and moving back to Ohio (Docket No. 12, pp. 55-56 of 662).  When asked, Plaintiff responded that her disability onset date of May 30, 2008, coincides with  the beginning of her illness (Docket No. 12, p. 56 of 662).  Plaintiff testified that since moving back to Ohio, she had tried to work for a temporary agency, but was terminated after one day (Docket No. 12, pp. 57-58 of 662).

Plaintiff explained that she cannot work because she has a fear of being around people, is tired of being referred to as "sir" because of her appearance, and would rather stay in the house (Docket No. 12, p. 59 of 662).

Plaintiff further elaborated that she does not talk to anyone, is depressed in general, and did not want to be at the hearing (Docket No. 12, p. 59 of 662). Plaintiff also stated that she prefers not to live, but would not harm herself. She added that her medicines are not working, that she previously smoked marijuana and has been trying to quit, but only marijuana, rather than her medicines, calms her down (Docket No. 12, p. 60 of 662).

According to Plaintiff, she still treats at the Nord Center (Docket No. 12, p. 62 of 662). When questioned about her compliance with treatment orders including hormone testing, Plaintiff responded that she refused additional testing because she knows what is wrong with her (Docket No. 12, pp. 62-63 of 662). Plaintiff testified that she vomits every other day and takes nausea medication (Docket No. 12, p. 63 of 662). She explained that her vomiting is triggered by thoughts or anger, then her chest caves in and she starts having anxiety attacks (Docket No. 12, p. 64 of 662). Plaintiff also takes Promethazine, Coumadin, Coreg, Imdur, Seroquel, Paxil, Xanax, Lisinopril, and Percocet (Docket No. 12, p. 64 of 662). Plaintiff noted that she had recently been in the hospital for five days just prior to the hearing with complaints of heaviness in her chest and stomach (Docket No. 12, p. 65 of 662).

Plaintiff testified that she last treated at the Nord Center on August 19, 2011 and had an upcoming appointment the following week (Docket No. 12, p. 65 of 662). Plaintiff described her typical day stating that she stays in her room, listens to music, and eats home-cooked meals if her mother cooks. Otherwise and most often, she eats junk food and prefers to be alone. Plaintiff explained that she and her Mother have a contentious relationship (Docket No. 12, p. 66 of 662). Plaintiff has no hobbies and doesn't perform household chores (Docket No. 12, p. 66 of 662). Plaintiff testified that in the past, she was more active, but now she gets sick thinking about having to get up, get dressed and go somewhere (Docket No. 12, p. 67 of 662).

During direct examination from her lawyer, Plaintiff testified that she gets angry and enraged when she thinks about "stuff" and that she "goes off" on people, such as her mother, and treats them poorly (Docket No. 12, p. 68 of 662). Plaintiff admitted that she "goes off" on her doctors all the time, and they don't understand

her.   She is tired of feeling the way that she does (Docket No. 12, p. 69 of 662).   Plaintiff explained her

frustration with the inability of doctors to help her (Docket No. 12, p. 69 of 662).

      **2.**    **VE TESTIMONY**

    The VE described Plaintiff's past work as kitchen helper, DOT[1] 318.687-010 and dining room attendant,

DOT 311.677-018, as  medium level of exertion, unskilled with a specific vocational preparation (SVP)[2] of 2;

shoe sales person, DOT 261.357-062, light, semi-skilled, with an SVP of 4, which Plaintiff performed at the

heavy level; security guard, DOT 372.667-034, light, semi-skilled, with an SVP of 3; telephone solicitor, DOT

299.357-014, sedentary, semi-skilled, with an SVP of 3 and appointment clerk, DOT 237.367-010, semi-skilled,

with an SVP of 3, and performed at a sedentary level (Docket No. 12, pp. 79-80 of 662).

    The ALJ then asked the VE to consider a hypothetical person of Plaintiff's age, education and vocational

background before posing her first hypothetical question:

> The person has no exertional limitations, but can interact occasionally and superficially with
> others and receive instructions and ask questions appropriately in a smaller or more solitary non-
> public work setting; that person can cope with the ordinary and routine changes in a work setting
> that is not fast paced or high demand.  Would that person be able to do any of Ms. McCall's past
> work?

(Docket No. 12, pp. 80-81 of 662).  After considering these limitations, the VE indicated that such a person

would not be capable of performing any of Plaintiff's past work (Docket No. 12, pp. 81-82 of 662).  The ALJ

followed up and asked the VE whether Plaintiff would be capable of performing any other work in the national

economy (Docket No. 12, p. 82 of 662).  The VE provided the jobs of cook helper, DOT 317.687-010, medium,

unskilled, with a SVP of 2, having approximately 10,000 such jobs in northeast Ohio, 32,000 in the State of

---

[1]  Dictionary of Occupational Titles ("DOT")

[2]  SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the
information, and develop the facility needed for average performance in a specific job-worker situation.
www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of
Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how
the occupations are performed.  www.occupationalinfo.org.

Ohio, and 873,000 in the national economy; kitchen helper, DOT 318.687-010, medium, unskilled, with an SVP of 2, having approximately 5,800 jobs in northeast Ohio, 17,000 in the State of Ohio, and 509,000 in the national economy; and cleaner or housekeeper, DOT 323.687-014, light, unskilled, with an SVP of 2, having 4,000 jobs in northeast Ohio, 13,000 in the State of Ohio, and 403,000 in the national economy (Docket No. 12, p. 82 of 662).  With no exertional limitations for the housekeeper job, the VE indicated that 8,000 such jobs exist in northeast Ohio, 26,000 in the State of Ohio, and 815,000 in the national economy (Docket No. 12, p. 82 of 662).

The ALJ posed the following hypothetical question: "If somebody had . . . really no useful ability to maintain regular attendance and be punctual within customary tolerances, would that person be able to obtain or maintain employment? (Docket No. 12, pp. 82-83 of 662).  The VE  answered " no," opining that attendance is probably the primary aspect of any employment (Docket No. 12, p. 83 of 662).  The ALJ followed up by asking, "and if the person had no ability to respond appropriately to changes in a routine work setting, would that affect their ability to . . . obtain or maintain employment?" (Docket No. 12, p. 83 of 662).  In reply, the VE noted that being unable to adapt to changes in a routine work setting would affect a hypothetical individual's ability to maintain employment (Docket No. 12, p. 83 of 662).  The ALJ then asked, "[i]f a person was unable to understand or remember and carry out simple instructions, how would that affect their ability to obtain or maintain employment?" (Docket No. 12, p. 83 of 662).  The VE explained that she views simple job instructions as corresponding to unskilled work and if one cannot follow simple instructions, they are not capable of performing the job (Docket No. 12, p. 83 of 662).

On cross-examination, Plaintiff's counsel asked the VE to return to the ALJ's first hypothetical, but to limit the hypothetical person to light work, and inquired whether there would be jobs that such an individual could perform? (Docket No. 12, p. 83 of 662).  The VE considered the hypothetical and responded that there would be jobs in the national economy that such an individual would be capable of performing, including the light duty job of housekeeper previously provided (Docket No. 12, p. 83 of 662).  In response to Plaintiff's

counsel, the VE provided other jobs including mail clerk, DOT 209.687-026, light, unskilled, with an SVP of 2, having approximately 1,300 jobs in northeast Ohio, 4,000 in the State of Ohio, and 98,800 in the national economy (Docket No. 12, p. 84 of 662).  The VE also noted that in these positions the individual usually works alone,  has occasional superficial interaction with others in a non-public or non-governmental setting (Docket No. 12, p. 84 of 662).

**B.    MEDICAL RECORDS**

Summaries of Plaintiff's medical records, to the extent necessary and relevant to the issues before this Court, follow.

**1.    MEMORIAL HERMANN HEALTHCARE SYSTEM**

- On August 3, 2007, Plaintiff was hospitalized after complaining of abdominal pain and vomiting (Docket No. 12, p. 318 of 662).  Dr. Jose R. Medina, M.D. evaluated Plaintiff and his clinical impression reflects acute abdominal pain and gastroesophageal reflux disease (GERD) (Docket No. 12, p. 320 of 662).

- On August 26, 2007, Plaintiff was again hospitalized after complaining of worsening and severe nausea and vomiting.  Her diagnoses included Polycystic ovarian syndrome, nausea, vomiting secondary to irritable bowel syndrome, esophagitis, and a family history of colon cancer. Plaintiff was discharged on August 30, 2007 (Docket No. 12, p. 329 of 662).

- On January 2, 2008, Plaintiff was admitted after complaining of difficulties breathing, dizziness, abdominal pain, diarrhea and vomiting.  After evaluation, Plaintiff was diagnosed with acute abdominal pain, vomiting, hyperglycemia, and fatty liver.  An ultrasound of Plaintiff's gallbladder noted hepatocellular disease, likely fatty liver, but that Plaintiff's gallbladder was normal.  X-rays of Plaintiff's chest were also normal (Docket No. 12, pp. 345-359 of 662).

**2.    EMH REGIONAL MEDICAL CENTER & NORTH OHIO HEART CENTER**

- On October 14, 2008, Plaintiff presented to the hospital complaining of vomiting episodes.  On examination, Plaintiff was described as crying-yelling, appearing agitated, anxious, and in distress.  Plaintiff's primary diagnosis was chronic nausea, vomiting, and mild hypokalemia (Docket No. 12, pp. 361-366 of 662).

- On July 14, 2009, Plaintiff visited the emergency room and was evaluated by Dr. Kim Yun, M.D., after complaining of abdominal pain and vomiting.  Plaintiff underwent a CT scan of her abdomen and pelvis, which revealed a left cystic adnexal mass most likely ovarian in nature, but that the remainder of Plaintiff's abdomen and pelvis was otherwise unremarkable.  Toxicology

results detected benzodiazepines and cannabinoids in Plaintiff's system.  She was discharged on July 15, 2009 and prescribed Phenergan[3] (Docket No. 12, pp. 453-486 of 662).

- On September 13, 2010, Plaintiff was hospitalized for chest pain.  According to the treatment notes, Plaintiff's ECG was consistent with acute ST elevation myocardial infarction.  Plaintiff underwent a left heart catheterization and a thrombectomy of her left main anterior descending artery, which failed to reveal  evidence of coronary artery disease (Docket No. 12, pp. 603-604 of 662).   On September 16, 2010, Plaintiff underwent a second catheterization and Dr. Christofferson concluded the Plaintiff's coronary anatomy was right dominant and recommended Plaintiff medicate with Coumadin[4] long term and maintain regular follow-ups with a primary care physician or cardiologist (Docket No. 12, pp. 607-608 of 662).   Plaintiff was discharged on September 21, 2010 (Docket No. 12, pp. 603-606; 653-661 of 662).

- On October 14, 2010, Plaintiff was hospitalized with epigastric and lower chest pain.  Plaintiff was evaluated by Dr. Deborah Vicario, M.D.  The results of Plaintiff's ECG revealed residual changes in the anterior and inferior leads suggestive of prior cardiac event.  Plaintiff was discharged on October 19, 2010.  Her medication list on discharge included Coreg,[5] Seroquel,[6]

---

[3] Phenergan is prescribed to prevent and treat nausea and vomiting. *Phenergan oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 10, 2014, 11:46 AM), http://www.webmd.com/drugs/2/drug-6606/phenergan-oral/details.

[4] Coumadin is prescribed to treat blood clots and to prevent new clots from forming. *Coumadin oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 10, 2014, 11:52 AM), http://www.webmd.com/drugs/2/drug-4069/coumadin-oral/details.

[5] Coreg is prescribed to treat high blood pressure and heart failure. *Coreg oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 10, 2014, 12:28 PM), http://www.webmd.com/drugs/2/drug-1634/coreg-oral/details.

[6] Seroquel is prescribed to treat mental/mood conditions including schizophrenia, and bipolar disorder. *Seroquel oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 10, 2014, 12:29 PM), http://www.webmd.com/drugs/2/drug-4718/seroquel-oral/details.

Xanax,[7] Paxil, Norvasc,[8] Plavix,[9] Protonix,[10] Imdur, and Coumadin (Docket No. 12, pp. 600-602; 651-652 of 662).

- On May 25, 2011, Plaintiff was evaluated for chest pain and anxiety in the emergency department by Dr. Vicario.  Plaintiff was described as tearful, alert, and in no acute distress.  On examination, Plaintiff was significant for hirsutism and S1 and S2 were present at her heart.  Plaintiff's toxicology screen was positive for cannabinoids, benzodiazepines and opiates. Dr. Vicario's assessment included chest pain, coronary artery disease with a history of two myocardial infarctions and, generalized myalgias.  Dr. Vicario recommended acute coronary syndrome protocol, telemetry, a state chest CT to rule out pulmonary embolism, and psychiatric and social work consultations (Docket No. 12, pp. 638-640;590-591 of 662).

- On July 24, 2011, Plaintiff was hospitalized after complaining of chest pain. Dr. George Wang, M.D., evaluated Plaintiff and ruled out a myocardial infarction on the basis of Plaintiff's ECGs and cardiac enzymes (Docket No. 12, pp. 588-599).  On physical examination, Plaintiff was described as morbidly obese and her heart sounds remote, faint and regular.  Plaintiff underwent a left heart catheterization to evaluate for potential thrombus.  Dr. Wang indicated that he doubted that Plaintiff had any acute coronary event.  He also opined that there was definitely some component of psychogenic issue, possible conversational disorder, depression and anxiety among other findings (Docket No. 12, pp. 627-630 of 662).  On discharge, Plaintiff's Carvedilol dosage was increased; Coumadin, an ACE inhibitor [11] was again prescribed  and it was recommended that she have a  metabolic blood panel and international normalized ratio (INR)[12] tests in one week (Docket No. 12, pp. 588-589 of 662).

---

[7]  Xanax is prescribed to treat anxiety and panic disorders. *Xanax oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD (Oct. 10, 2014, 12:30 PM), http://www.webmd.com/drugs/2/drug-9824/xanax-oral/details.

[8] Norvasc is prescribed to treat high blood pressure. *Norvasc oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 10, 2014, 12:32 PM), http://www.webmd.com/drugs/2/drug-5942/norvasc-oral/details.

[9] Plavix is prescribed to help prevent the formation of blood clots in arteries to the heart. *Clopidogrel (Plavix): MedlinePlus Medical Encyclopedia*, MEDLINEPLUS, (Oct. 10, 2014, 12:33 PM), http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000100.htm.

[10] Protonix is prescribed to treat problems in the stomach and esophagus. *Protonix oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 10, 2014, 12:35 PM), http://www.webmd.com/drugs/2/drug-18142/protonix-oral/details.

[11]  Angiotensin-converting enzyme (ACE) inhibitors prevent the body from producing a substance that narrows the blood vessels in the cardiovascular system. *Angiotensin-converting (ACE) inhibitors*, MAYO CLINIC, (Oct. 10, 2014, 3:36 PM), http://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/ace-inhibitors/art-20047480.

[12]  An International Normalized Ratio (INR) or a prothrombin time is a blood test that measures the length of time required for a blood clot to form.  *Prothrombin Time (PT) Blood Test for Clotting Time*, WEBMD, (Oct. 10, 2014, 1:04 PM), http://www.webmd.com/a-to-z-guides/prothrombin-time.

a. OFFICE TREATMENT RECORDS - DR. RYAN D. CHRISTOFFERSON, M.D.

- On November 19, 2010, Plaintiff was evaluated by Dr. Christofferson following her hospitalization for acute coronary syndrome and myocardial infarction. Plaintiff was described as crying and tearful in the office.  It was also noted that Plaintiff had not taken her Paxil[13] for a week.  Plaintiff complained of frequent abdominal pain, nausea, vomiting, and chest discomfort.  Dr. Christofferson opined that Plaintiff had possible coronary artery spasm, hypertension, hyperlipidemia, depression, anxiety and abject status. Dr. Christofferson increased Plaintiff's Imdur[14] and noted that an ECG in the office did not demonstrate any ischemia (Docket No. 12, pp. 596-599; 646-650 of 662).

- On February 18, 2011, Plaintiff reported occasional chest pain and occasionally having taken nitroglycerin.  Plaintiff indicated that she has been in good medication compliance.  Dr. Christofferson, added Lisinopril[15] and metoprolol succinate[16] to Plaintiff's medication regimen and discontinued her  Carvedilol[17] (Docket No. 12, pp. 594-595; 643-644 of 662).

- On May 13, 2011, Plaintiff complained of heart palpitations and skipped beat sensation in her chest.  As a result, Plaintiff indicated that she felt nervous and admitted that she had not taken her medications.  Plaintiff was evaluated by Dr. Christofferson who opined that she was having premature contractions and recommended that Plaintiff be placed back on her medications (Docket No. 12, pp. 592-593; 641-642 of 662).

- On July 27, 2011, Plaintiff underwent a catherization from Dr. Christofferson who concluded that Plaintiff's coronary anatomy is mixed dominance.  Dr. Christofferson recommended medical management and that Plaintiff should maintain regular follow-up with her primary care physician and/or cardiologist (Docket No. 12, pp. 586-587 of 662).

- On August 19, 2011, Plaintiff had a follow up with Dr. Christofferson after her hospitalization

---

[13] Paxil is prescribed to treat conditions including depression, panic attacks, and anxiety disorders. *Paxil CR oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 10, 2014, 12:09 PM), http://www.webmd.com/drugs/2/drug-32900/paxil-cr-oral/details.

[14] Imdur is prescribed to prevent chest pain by relaxing and widening blood vessels to improve blood flow. *Imdur oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 10, 2014, 12:11 PM), http://www.webmd.com/drugs/2/drug-2552/imdur-oral/details.

[15] Lisinopril is prescribed to treat high blood pressure. *Lisinopril: MedlinePlus Drug Information*, MEDLINEPLUS, (Oct. 10, 2014, 3:23 PM), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html.

[16] Metoprolol succinate is a beta-blocker prescribed to treat chest pain, heart failure and high blood pressure. *metoprolol succinate oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 10, 2014, 3:25 PM), http://www.webmd.com/drugs/2/drug-8814/metoprolol-succinate-oral/details.

[17] Carvedilol is prescribed to treat high blood pressure and heart failure. *carvedilol oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 10, 2014, 3:27 PM), http://www.webmd.com/drugs/2/drug-5574/carvedilol-oral/details.

for chest pain. Plaintiff complained of feeling a fluttering sensation in her chest all of the time and constant chest pain.  Plaintiff reported that she had stopped taking her medications after becoming frustrated, but had evidently restarted taking some of the medications prior to her appointment.  On examination, Plaintiff was described having now essentially normal appearing coronary arteries. Dr. Christofferson continued Plaintiff on aspirin, Coumadin, and increased her Carvedilol for her elevated heart rate and blood pressure.  Plaintiff was also continued on Isosorbide[18] (Docket No. 12, pp. 584-585 of 662).

### b.    CONSULTATION - DR. BELAGODU KANTHARAJ, M.D.

On July 26, 2011, Plaintiff underwent a consultation with Dr. Belagodu for management of her thrombophilia secondary to hormone imbalance.  During the consultation, Plaintiff reported constant left-sided chest pain and several episodes of nausea and vomiting.  On examination, Plaintiff was described as alert, in no respiratory distress, and morbidly obese.  Plaintiff's head, eyes, ears, nose and throat (HEENT) were remarkable for facial hair and a beard and it was otherwise noted that she had excessive hair.  Plaintiff was negative for hereditary thrombophila, her homcystine level was slightly high, and Plaintiff was noted as having a hormone imbalance with Hirsutism, which might have predisposed her to develop coronary artery thrombosis.  Dr. Belagodu recommended Plaintiff maintain lifelong anticoagulation with Coumadin (Docket No. 12, pp. 634-635 of 662).

### 3.    THE NORD CENTER

### a.    DR. CAROLYN PARAS, M.D.

### i.    TREATMENT

The record contains treatment notes from four treatment sessions Plaintiff had with Dr. Paras for medication management on October 21, 2008, November 12, 2008, December 10, 2008, and January 7, 2009

---

[18]  Isosorbide is prescribed to prevent and treat chest pain by relaxing the blood vessels to the heart to increase blood and oxygen supply. *Isosorbide: MedlinePlus Drug Information*, MEDLINEPLUS, (Oct. 10, 2014, 12:26 PM), http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682348 html.

(Docket No. 12, pp. 391; 390; 386; 379 of 662). [19]

### ii.   PSYCHIATRIC EVALUATION

On October 21, 2008, Plaintiff underwent an initial psychiatric evaluation with Dr. Paras and the typed report of that evaluation details Plaintiff's reported history of her present illness, medical, and surgical history. During the evaluation, Plaintiff denied any use of alcohol or other drugs, except marijuana, which she had used two days earlier.  Dr. Paras described Plaintiff as cooperative, having fair eye contact, emotional, with a normal rate of speech, depressed mood, and without suicidal or homicidal thoughts.  Plaintiff denied auditory or visual hallucinations, but the notes indicate that she expressed paranoid ideations.  Plaintiff was also described as alert, oriented, with organized thoughts and appropriate answers.  Plaintiff was unable to complete serial sevens and indicated that she was unable to think and concentrate very well.  Dr. Paras opined that Plaintiff's insight was fair and noted that Plaintiff agreed to the suggestion that she avoid using marijuana.  Dr. Paras' diagnosis for Plaintiff included Major Depression, single, severe with psychotic features rule out dysthymia, anxiety not otherwise specified, and cannabis abuse.  Plaintiff was assessed a Global Assessment of Functioning (GAF)[20] score of 50, for serious symptoms.  Dr. Paras' recommendation reflects that she discussed medication options with Plaintiff, including taking Seroquel for paranoia and hallucinations, Celexa for her mood and anxiety, Konopin for severe anxiety symptoms, and that Plaintiff stop using marijuana  (Docket No. 12, pp. 418-421 of 662).

### b.   DR. LORAINNE CHRISTIAN, M.D.

### i.   PSYCHIATRIC EVALUATION SUMMARY UPDATE

---

[19] Unfortunately, the treatment notes for each of these sessions are handwritten and difficult to read.  Consequently, only the October 21, 2008 evaluation is specifically addressed.

[20] Global Assessment of Functioning (GAF) scores are subjectively assessed to reflect the social, occupational, and psychological functioning of adults. *Global Assessment of Functioning (GAF) Scale*, MICH. ST. UNIV., (Oct. 10, 2014, 1:11 PM), https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf.

On February 17, 2009, Dr. Christian completed a summary update on Plaintiff's psychiatric evaluation. The results of Plaintiff's mental status examination described Plaintiff as appearing male noting facial hair growth.  Plaintiff was otherwise described as emotional, feeling helpless and hopeless, depressed, without homicidal or suicidal ideations, no hallucinations, but express paranoid ideations. Dr. Christian opined that Plaintiff was alert, oriented, with no obvious cognitive deficits, appropriate in manner and speech, with limited insight and judgment.  Plaintiff's diagnosis was noted as Major Depression, recurrent, without psychotic features, Panic Disorder without Agoraphobia, Cannabis Abuse, and rule out Bipolar Disorder.  Dr. Christian's treatment plan reflects that Plaintiff's Celexa medication was changed to Pexeva, her Seroquel dosage increased, and the frequency of her Xanax medication also increased.  There was a note to refer Plaintiff for a hormonal work up as well (Docket No. 12, pp. 415-417 of 662).

## ii.  TREATMENT

- On February 13, 2009, Plaintiff had her first treatment session with Dr. Christian for depression, anxiety and to rule out any hormonal problem.  Plaintiff was described as appearing male with hair growth on her face and as having hormonal problems.  Plaintiff complained of mood swings, anxiety, feeling hopeless and helpless, and distressed about not finishing school.  Dr. Christian started Plaintiff on Pexera and Xanax (Docket No. 12, p. 432 of 662).

- On February 20, 2009, Plaintiff indicated that there had been no change in her symptoms.  Dr. Christian noted that Plaintiff did not cry once, but had claimed that she was still vomiting. Plaintiff's Seroquel medication was increased and her Xanax and Pexera continued.  Plaintiff reported that she was not interested in any treatment for her hormonal assessment and that the only thing that helps her is smoking tetrahydrocannabinol (THC) (Docket No. 12, p. 430 of 662).

- On March 25, 2009, Plaintiff reported that she had run out of Pexera and was vomiting.  Dr. Christian described Plaintiff as crying continuously during the session, being focused on the death of several family members, including a six month old cousin and also that of her mentor. Plaintiff complained that she felt trapped by her illness.  Dr. Christian's notes reflect that Plaintiff's medications were continued and the session was extended to discuss new sleep medication, fears about her Mom and how to begin the process for her return to Ohio State.
- (Docket No. 12, p. 426 of 662).

- On April 22, 2009, Plaintiff described being angry and upset with the world, but denied suicidal or homicidal ideations.  Plaintiff was noted as appearing anxious and distressed.  Dr. Christian increased Plaintiff's Xanax and changed her Seroquel medication to Seroquel XR.  Plaintiff

reported that she was sleeping better with Seroquel and needed to be able to take two Xanax when she has panic symptoms (Docket No. 12, p. 508 of 662).

- On June 12, 2009, Plaintiff indicated having ongoing stresses related to her finances and completing her college degree. Plaintiff's affect was described as appearing brighter and calmer. Plaintiff reported that she was doing better with her anxiety and vomiting, which she noted still occurs when she is stressed. Dr. Christian continued Plaintiff's medications (Docket No. 12, p. 503 of 662).

- On August 12, 2009, Plaintiff reported ongoing frustration, feeling helpless and hopeless, but denied any intent to harm herself. Plaintiff indicated that she had been living with her mom, has no money, or job, and had been vomiting more. Dr. Christian increased Plaintiff's Paxil medication (Docket No. 12, pp. 497 of 662).

- On September 29, 2009, Plaintiff was described as being upset that people mistake her for a "guy" or assume that she is a male trying to look like a female. She commented that Nord staff address her as male. Plaintiff denied suicidal or homicidal ideations. She reported commuting to Ohio State for a class, but that she did not have money for books or a computer and cannot live on campus (Docket No. 12, p. 492 of 662).

- On November 20, 2009, Plaintiff noted feeling overwhelmed by her life, indicated that she was not doing well at school, and having legal and relationship issues. Plaintiff was described as tearful and feeling helpless and hopeless, but denied any suicidal and psychosis symptoms. Dr. Christian increased Plaintiff's Paxil medication, discussed her stressors and concerns (Docket No. 12, p. 566 of 662).

- On March 30, 2010, Plaintiff indicated that she was taking her last class before graduating. Plaintiff was described as upset since she had been told that she cannot use THC and get scripts for Xanax and advised to quit using THC. Plaintiff was informed that her medications would be continued so long as she submitted to drug testing (Docket No. 12, p. 561 of 662).

- On July 6, 2010, Plaintiff reported that she had obtained her degree in criminology and was looking for a job. Plaintiff also reported that she was still smoking THC when available from friends and indicated that she was still vomiting. Plaintiff was described as irritable, having no psychosis, and her weight was 279 pounds. Dr. Christian advised Plaintiff that she would not be prescribed Xanax if she uses THC and would need drug testing (Docket No. 12, pp. 580-581 of 662).

- On February 4, 2011, Plaintiff reported doing better, sleeping a lot during the day, but not being able to sleep at night. Plaintiff was living with her girlfriend, but had been staying with her mother. Plaintiff indicated that she had experienced problems with intermittent vomiting, was taking Phenergan, which helped, and informed Dr. Christian that she went to the hospital about a month ago after a panic attack and was kept overnight. Plaintiff also detailed her heart issues and the possibility of a stent being put in. Plaintiff was described as depressed, denying psychotic symptoms, but she reported hearing noises, and had experienced no vomiting or gagging on that

13

day.  According to the notes, Plaintiff was not abusing Xanax, but that it would be checked with a drug screen on that day.  It was noted that since Plaintiff reported THC use two weeks earlier, the drug test might be positive, but that Dr. Christian would continue the Xanax medication and repeat the drug screen during her next visit (Docket No. 12, pp. 618-619 of 662).

- On April 8, 2011, Plaintiff was described as having flat affect and organized thoughts.  Dr. Christian's notes indicate that Plaintiff had not been compliant with her Paxil because she did not have the medications despite being given instructions about how to obtain medications.  Plaintiff was advised about where she could obtain the medications for the lowest cost.  Plaintiff indicated that she wanted to continue services at the Nord Center and was experiencing anxiety about getting a new worker on her case.  Plaintiff agreed to work with Dr. Christian until a counseling position at the agency is filled (Docket No. 12, pp. 614-615 of 662).

### iii.  MENTAL STATUS QUESTIONNAIRES

On April 17, 2009, Dr. Christian completed a questionnaire for Plaintiff reporting that she was first seen at the Nord Center by a doctor on October 2, 2008, but that Dr. Christian first saw Plaintiff on February 13, 2009 and last saw her on March 25, 2009.  Plaintiff was described as being neat and clean in appearance, talkative, but is angry, depressed, has flat affect, extreme anxiety, a negative outlook on the future, is oriented x 3, has difficulty concentrating, poor abstract reasoning, short-term memory loss, poverty of the mind, an IQ within normal range and poor insight and judgment.  The form indicates Plaintiff reported no history of substance abuse, but uses marijuana and has not engaged in aggressive behaviors, illegal activities, and is otherwise not dependent on substances.  Plaintiff's diagnosis is listed as Major Depression without psychiatric features, and Panic Disorder without agoraphobia.  Plaintiff's medications include Pexeva,[21] Seroquel, and Xanax.  Plaintiff's ability to  remember, understand and follow directions was assessed as adequate, her abilities to maintain attention, concentration, and persistence, were all assessed as poor.  Plaintiff was also graded as being poor in social interaction, adaptation, and it was opined that Plaintiff would react poorly and be unable to manage the work pressures in a work setting (Docket No. 12, pp. 393-395 of 662).

---

[21] Pexeva is prescribed to treat depression, panic attacks, obsessive-compulsive disorder, and anxiety disorders by restoring the balance of serotonin in the brain. *Pexeva oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Oct. 10, 2014, 3:43 PM), http://www.webmd.com/drugs/2/drug-78102/pexeva-oral/details.

Another included questionnaire dated October 6, 2009,  reflects that Plaintiff was first seen by Dr. Christian on February 17, 2009 and last seen on September 29, 2009 (Docket No. 12, p. 510 of 662).  Dr. Christian reported  Plaintiff's abnormalities as paranoia, easy to anger and flat effect.  Dr. Christian opined that Plaintiff's cognitive status indicates she has low frustration tolerance, limited insight, is easily confused and has a normal intellectual range.  The form reflects that Plaintiff experiences psychogenic vomiting on an almost daily basis preventing Plaintiff from activities, that she self-isolates, has destructive self-esteem and feels helpless and hopeless.  Plaintiff was described as being in denial that her gay lifestyle is an issue and that Plaintiff looks and dresses as a male.  The form also reflects that Plaintiff is compliant with medication and appointments, able to poorly tolerate stress, and capable of managing any benefits.  Plaintiff's diagnosis was listed as Major Depression, recurrent without psychotic features (Docket No. 12, pp. 510-512 of 662).

### c.     OTHER NORD PROVIDERS - COUNSELING & TECHNICAL SERVICES

Plaintiff met with counselors, social worker and technicians at the Center on approximately forty-four occasions between October 20, 2008 and August 18, 2011.

### i.     ADULT DIAGNOSTIC ASSESSMENT - BEATRICE LASSIC, M.ED., LPC

On November 5, 2008, Plaintiff underwent a diagnostic assessment by Ms. Lassic[22] and reported a history of physical, emotional, and domestic abuse.  Ms. Lassic opined that Plaintiff had Generalized Anxiety Disorder, Bereavement, Cannabis Dependence, Dependent Personality Disorder, and she assessed her a GAF score of 45 for serious symptoms.  Ms. Lassic's treatment recommendations included individual counseling, seeing a psychiatrist for medication, and seeking the assistance of Lorain County Alcohol and Drug Abuse Services (LCADA).  Plaintiff was advised to stop using marijuana when taking her prescribed psychotropic medications. The results of Ms. Lassic's mental status exam reflects that Plaintiff was suffering from visual hallucinations,

---

[22]  Although Ms. Lassic is not an "acceptable medical source," her opinion is considered in accordance with SSR 06-03p.

was depressed, anxious, agitated, suffering from anhedonia,[23] withdrawn, restless, and experiencing loss of interests.  Plaintiff was described as being of average intelligence.  A substance abuse worksheet notes that Plaintiff had used illegal drugs within the past 12 months, including four to five marijuana joints on a daily basis over the past year (Docket No. 12, pp.  398-412 of 662)

## ii.    DAILY ACTIVITIES QUESTIONNAIRE

On April 17, 2009, Ms. Lassic completed a form concerning Plaintiff's daily activities and reported first treating Plaintiff on October 20, 2008 and last treating Plaintiff on February 13, 2009.  According to Ms. Lassic, Plaintiff lives with her mother, has non-adaptive behaviors that prevent her from independent living, gets along poorly with family, friends, and neighbors, and self-isolates.  Ms. Lassic noted that Plaintiff has not attempted to return to work, has been previously fired, and suffers from psychogenic vomiting.  Ms. Lassic opined that Plaintiff has a minimal ability to do household chores, has good personal hygiene, no ability to shop, drive or use public transportation, and cannot do her own banking or engage in hobbies.  Plaintiff's ability to keep her medical appointments was noted as good, but her ability to maintain counseling appointments fair to poor.  Plaintiff's treatment is listed as medication therapy, which has not impacted her complaints, problems, and behaviors.  Ms. Lassic indicated that Plaintiff is resistant to counseling (Docket No. 12, pp. 396-397 of 662).

## 4.    MEDICAL SOURCE STATEMENT - COURTNEY GILBERT

On August 4, 2011, Courtney Gilbert completed a source statement for Plaintiff in which she opined that Plaintiff was no better than fair in any of the activities listed under the three categories of making occupational adjustments, intellectual functioning, and making personal and social adjustment.  The statement is unsupported by any explanations, medical or clinical findings to support the assessment (Docket No. 12, pp. 582-583 of 662).

## C.    CONSULTATIVE EXAMINATION - RONALD G. SMITH, PH.D.

---

[23]  Anhedonia is "a psychological condition characterized by inability to experience pleasure in normally pleasurable acts." *Anhedonia*, MERRIAM-WEBSTER DICTIONARY, (Oct. 10, 2014, 3:48 PM), http://www.merriam-webster.com/dictionary/anhedonia.

On February 23, 2009, Plaintiff underwent a psychological evaluation with Dr. Smith. Plaintiff reported relocating to Elyria, Ohio from Houston in October 2008. Plaintiff indicated that she lived with her mother but also stays with her cousin or friends because she did not feel comfortable at her mother's place. Dr. Smith's examination notes reflect that Plaintiff is a high school graduate, attended Ohio State University for four years, but left four classes shy of completing her bachelor's degree in criminology. Plaintiff reported previously working as a customer service representative on the phone, and jobs at Foot Locker, Target, and a car dealership. According to Dr. Smith's notes, Plaintiff indicated that she sees a counselor and psychiatrist. Plaintiff described her history with feeling sick noting that she was a track star in college and was supposed to go to the 2004 Olympics before falling ill. Plaintiff noted being prescribed Celexa, Klonopin and Seroquel in the past without success. Plaintiff was taking Xanax, Paxil, and Seroquel. Plaintiff also indicated taking Phenergan for nausea and vomiting. Plaintiff denied a past of sports enhancing drugs, but indicated she tried smoking marijuana a week and a half ago and smoked marijuana after getting out of athletics. Dr. Smith diagnosed Plaintiff with Dissociative Disorder not otherwise specified and Borderline Personality Disorder. With respect to Plaintiff's work-related mental abilities, Dr. Smith opined she would be severely impaired in her abilities to relate to others in a work situation, understand, remember, and follow instructions, and withstand stress associated with a day-to-day work activities. Finally, Dr. Smith concluded that Plaintiff would require assistance handling funds if they were awarded (Docket No. 12, pp. 367-373 of 662).

**D.** **THE AGENCY'S MEDICAL FINDINGS**

**1.** **INITIAL CONSIDERATION**

On June 6, 2009, Dr. Patricia Semmelman, Ph.D., completed a Psychiatric Review Technique (PRT) for Plaintiff which reflects that a RFC assessment was necessary and a coexisting nonmental impairment required referral to another medical specialty. Plaintiff's PRT was evaluated based on listings 12.04 for Affective Disorders and 12.06 for Anxiety-Related Disorders. Dr. Semmelman determined that Plaintiff's Depression, not

17

otherwise specified, does not precisely satisfy the diagnostic criteria for listing 12.04 for Affective Disorders. Similarly, Plaintiff's Anxiety not otherwise specified was also determined not to precisely satisfy the diagnostic criteria of the Anxiety-Related Disorder listing.  Dr. Semmelman rated as mild  Plaintiff's  restrictions of activities of daily living and rated as  moderate restrictions in social functioning, maintaining concentration, persistence or pace, and otherwise noted no episodes of decompensation of extended duration (Docket No. 12, pp. 434-447 of 662).

Also on June 6, 2009, Dr. Semmelman, completed a mental residual functional capacity assessment for Plaintiff.  Dr. Semmelman found Plaintiff moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted, sustain concentration, persistence and pace, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distraction, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in the work setting (Docket No. 12, pp. 448-451 of 662).

## 2.    RECONSIDERATION

On January 19, 2010, Dr. Elizabeth Das, M.D. determined the initial decision rendered on June 11, 2009 was affirmed as written, noting that on reconsideration Plaintiff did not allege any physical changes, worsening, or new physical complaints.  Furthermore, Dr. Das concluded that the new medical evidence of record did not suggest that Plaintiff has any severe medical impairments (Docket No. 12, p. 554 of 662). On December 24, 2009, Dr. Karen Steiger, Ph.D., also determined that the previous mental RFC rendered by Dr. Semmelman rendered on  June 6, 2009 was affirmed by the medical record in the case.  Dr. Steiger detailed Plaintiff's progress observing that she had returned to school commuting to OSU which was an improvement from August 2009. Dr. Steiger indicated that there is no significant difference in Plaintiff's functional limitations.  Although Plaintiff reported four panic attacks a day, Dr. Steiger found them insufficiently documented in the medical evidence

(Docket No. 12, p. 553 of 662).

### III. STANDARD OF DISABILITY

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*, 2014 WL 916945, *2 (N.D. Ohio 2014). At step one, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). At step two, the claimant must show that she suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing *Abbott*, 905 F.2d at 923). At step three, the claimant must demonstrate that her impairment or combination of impairments meets or medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014). If the claimant meets her burden she is declared disabled, however, if she does not, the Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a) (West 2014). In making this determination, the regulations require the Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014). At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014). Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b), 416.965(a) (West 2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014). If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and

19

final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available. 20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014).  While the claimant has the burden of proof in steps one through four.  The Commissioner has the burden of proof at step five to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  The Commissioner's finding must be "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(citation omitted).  If a claimant can make such an adjustment the claimant will be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v), (g) (West 2014).  If an adjustment cannot be made then the claimant is disabled. *Id.*

### IV. COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Andreas made the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2011.

2.  Plaintiff has not engaged in substantial gainful activity since May 30, 2008, the alleged onset date.

3.  Plaintiff has the following severe impairments: cannabis dependence, polycystic ovary syndrome, depression, anxiety, dissociative disorder not otherwise specified and borderline personality disorder.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, ALJ Andreas found that Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can interact occasionally and superficially with others, receive instructions and ask questions appropriately in a smaller or more solitary and nonpublic work setting.  She can cope with the ordinary and routine changes in a work setting that is not fast paced or of high demand.

20

6.      Plaintiff is unable to perform any past relevant work.

7.      Plaintiff was born on July 10, 1982 and was 25 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.      Plaintiff has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

10.     Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Social Security Act, from May 30, 2008, through the date of this decision.

(Docket No. 12, pp. 29-40 of 662).

## V. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006). On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Miller*, 2014 WL 916945, at *3 (quoting 42 U.S.C. § 405(g)). "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance." *Miller*, (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)). "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified

based upon the record.'" *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VI. DISCUSSION

### A.    ANALYSIS

Plaintiff argues that the ALJ's decision is not supported by substantial evidence and alleges that the ALJ: (1) failed to properly adhere to the treating physician rule with respect to his analysis of Dr. Christian's opinions and; (2) erred in discounting Dr. Smith's findings without providing adequate reasons for doing so (Docket No. 17).  Defendant generally responds and asserts that the ALJ's decision is supported by substantial evidence (Docket No. 19).

#### 1.    DR. CHRISTIAN'S OPINION

In Plaintiff's first assignment of error,  she alleges that the ALJ failed to follow the treating physician rule in evaluating the opinions of Nord Center treating psychiatrist Lorraine Christian, M.D. and erroneously found Dr. Christian's report was based on two visits and thus rendered by a non-treating source.  Plaintiff also contends that the ALJ failed  when evaluating Dr. Christian's opinion to consider at least 14 other sessions Plaintiff had with Nord Center professionals, including four with psychiatrist Carolyn Paras, M.D..  Finally, Plaintiff challenges the ALJ's treating physician analysis and argues that the ALJ failed to apply the requisite factors and provide "good reasons" for giving the psychiatrist's opinions "little weight" in the analysis (Docket No. 17).

##### a.    THE TREATING PHYSICIAN RULE

Federal regulations prescribe certain standards an ALJ must comply with in assessing the medical evidence contained in the record.  The treating physician rule is one such standard and requires that a treating

source's opinion be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and not otherwise "inconsistent with the other substantial evidence in the case record." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)); *Blakley*, 581 F.3d at 406; *see also* SSR 96-2P, 1996 WL 374188, *1 (July 2, 1996). The regulations define a treating source as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had an ongoing treatment relationship with you." 20 C.F.R. § 416.902 (West 2014). The physician, psychologist, or other acceptable medical source must treat the claimant "'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)(quoting *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)). The treating physician rule stems from the belief that a claimant's treating physicians are best positioned, as medical professionals, to provide a detailed picture of the claimant's impairment and can provide unique perspective that might not otherwise be obtained from the objective evidence or other reports of examinations. *See* 20 C.F.R. § 404.1527(c)(2) (West 2014).

Where a treating physician's opinion is not given controlling weight, there remains a rebuttable presumption that such opinion is entitled great deference. *Rogers*, 486 F.3d at 242 (citation omitted). To reject a treating physician's opinions an ALJ must provide "good reason" for doing so in their decision to make it sufficiently clear to "subsequent reviews the weight the adjudicator gave the treating source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2P, 1996 WL 374188, *5). "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where the claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (citation omitted). To comply with the obligation to provide good reasons for

23

discounting a treating source's opinion, the ALJ must (1) state that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record; (2) identify evidence supporting such finding; and (3) explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion. *Allums v. Commissioner*, 2013 WL 5437046, *3 (N.D.Ohio 2013) (citing *Wilson*, 378 F. 3d at 546). Those factors require the ALJ to consider the length, frequency, nature and extent of the treatment relationship, the evidence the medical source presents to support their opinion (supportability), the consistency of the opinion with the record as a whole, the specialization of the opinion, and any other factors which tend to support or contradict the opinion.  20 C.F.R. § 416.927(c)(2) (West 2014).

For medical opinions rendered by sources that cannot be classified as "treating sources," the regulations provide a framework for evaluating such opinions.  *See* 20 C.F.R. § 416.927(c) (West 2014). "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source") . . . and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013)(citation omitted).  In evaluating these opinions, the regulations require the ALJ to consider the § 416.927(c)(2) factors for all medical opinions that are not entitled to controlling weight.

### b.    DR. CHRISTIAN IS A TREATING SOURCE

Plaintiff alleges that the ALJ made a fundamental error in weighing Dr. Christian's opinions, arguing that the ALJ's decision notes that Dr. Christian had seen Plaintiff twice, when in fact Dr. Christian had seen Plaintiff on four occasions (Docket No. 17, p. 17 of 20).  Plaintiff argues that the ALJ's error is fundamental because at a minimum the ALJ overlooked two additional visits Plaintiff had with Dr. Christian (Docket No. 12, p. 17 of

24

20). Further, Plaintiff contends that the ALJ's decision cannot be based on substantial evidence since the ALJ did not review the record (Docket No. 12, p. 17 of 20). The Plaintiff's contentions are well-taken.

In his analysis of the opinion evidence, ALJ Andreas addressed and summarized State Agency medical consultant Dr. Patricia Semmelman's findings, which included highlighting inconsistencies between Plaintiff's reports and the treatment notes of Dr. Christian and consultative examiner Dr. Smith. Among ALJ Andreas' summation of Dr. Semmelman's findings in his decision, the ALJ wrote that "Dr. Semmelman observed that [Dr. Christian] had only seen the claimant twice and therefore, had not established a treating relationship with the claimant" (Docket No. 12, p. 36 of 662). Concluding that Dr. Semmelman's opinion about Plaintiff's limitations was wholly consistent with the evidence and Plaintiff's RFC, ALJ Andreas gave Dr. Semmelman's opinion great weight in his analysis (Docket No. 12, p. 36 of 662).

Next, ALJ Andreas addressed Dr. Christian's opinions, determining that they were based upon contradictory and incorrect information that is inconsistent with the evidence of record as a whole (Docket No. 12, p. 36 of 662). The ALJ also determined that Dr. Christian had not established a treating physician relationship with Plaintiff once again referencing Dr. Semmelman's statement that Dr. Christian had only seen Plaintiff twice (Docket No.1 2, pp. 36-37 of 662). Therefore, ALJ Andreas assigned Dr. Christian's opinion little weight (Docket No. 12, p. 37 of 662).

The record reflects that Plaintiff's most extensive mental health treatment with an "acceptable medical provider" was with Dr. Christian. From February 13, 2009 through April 8, 2011, Dr. Christian treated Plaintiff 13 times. The relevant inquiry, however, is not the total length of the treatment relationship, but whether Dr. Christian was a treating source at the time she rendered her opinion. *Torres v. Comm'r of Soc. Sec*., 490 Fed.Appx. 748, 752 n.2 (6th Cir. 2012)(unpublished)(citing *Kornecky v. Comm'r of Soc. Sec*., 167 Fed.Appx. 496, 506 (6th Cir. 2006)(unpublished)); *Kane v. Astrue*, 2011 WL 3353866, at *7 (N.D. Ohio 2011)(unpublished). Dr. Christian completed her first Mental Status Questionnaire for Plaintiff on April 17,

2009.  At that time, Dr. Christian had treated Plaintiff four times: February 13, 2009 (for 60 minutes), February 17, 2009 (no time listed), February 20, 2009 (for 30 minutes), and March 25, 2009 (for 45 minutes) (Docket No. 12, pp. 432; 415-417; 430; 426 of 462.  Despite such evidence, ALJ Andreas repeatedly asserts in his decision that Dr. Christian saw the Plaintiff twice (Docket No. 12, pp. 37-37 of 662).  Obviously, ALJ Andreas was incorrect and he erroneously relied on the incorrect fact in determining that Dr. Christian did not establish a treating physician relationship.

Defendant contends that the ALJ reasonably relied on Dr. Semmelman's findings, noting that "the issue is not one of frequency of visits, but one of knowledge of the claimant" (Docket No. 19, p. 12 of 17).  Although Defendant concedes that the ALJ incorrectly found Plaintiff had treated twice with Dr. Christian, the government insists it was a "misstatement" resulting in "harmless error," and claims that Dr. Christian could not have offered a longitudinal view of Plaintiff's condition having only treated Plaintiff six weeks before rendering her opinions (Docket No. 19, p. 12 of 17).  Defendant asserts that the focus of the Court's inquiry should be on the fact that Plaintiff presented inconsistent information over those six weeks (Docket No. 19, p. 12 of 17).  Unfortunately, Defendant cites no legal authority in support of its contentions, and this Court is not concerned with the reasonableness of ALJ's reliance, but instead whether the ALJ's decision is supported by substantial evidence in the record.

After reviewing the record in this case, the undersigned Magistrate finds the ALJ's decision is not supported by substantial evidence.  "The Supreme Court has long recognized that a federal agency is obliged to abide by the regulations it promulgates." *Sameena, Inc. v. United States Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998)(citing *Vitarelli v. Seaton*, 359 U.S. 535, 545 (1959); *Service v. Dulles*, 354 U.S. 363, 372 (1957); *Accardi v. Shaugnessy*, 347 U.S. 260, 267 (1954)).  "The failure of an ALJ to follow the procedural rules for assigning weight to the opinions of treating sources and the giving of good reason for the weight assigned denotes a lack of substantial evidence even if the decision of the ALJ may be justified based upon the record." *Allums*, 975

F.Supp.2d 823 at 830 (citing *Blakely*, 581 F.3d at 407).

Pursuant to 20 C.F.R. § 416.945(3), the ALJ was required to assess Plaintiff's RFC "based on all of the relevant medical and other evidence" including "any statements about what [the claimant] can still do that have been provided by medical sources." *See* 20 C.F.R. § 416.945(3) (West 2014).  Section 416.927(c) provides that "[r]egardless of its source, [the Agency] will evaluate every medical opinion [the Agency] receive[s]," using the factors set forth in the regulations for evaluating medical opinions. *See* 20 C.F.R. § 416.927(c) (West 2014).  In this case, the ALJ's decision clearly failed to comply with either of these regulations.  By virtue of incorrectly noting that Dr. Christian only treated Plaintiff twice, it follows that the ALJ failed to consider at least two additional treatment dates which were also relevant to the ALJ's determination.

Notwithstanding the ALJ's failure to consider Dr. Christian's other two treatments of Plaintiff, the undersigned Magistrate observes that the ALJ failed to address a second completed questionnaire concerning Plaintiff's mental health, which is included with materials dated October 6, 2009 and signed by Dr. Christian (Docket No. 12, pp. 510-512 of 662).[24]  By October 6, 2009, Dr. Christian had treated Plaintiff a total of eight times from February 13, 2009 through September 29, 2009, which would have certainly qualified her opinion as that of a treating source (Docket No. 12, pp. 432; 430; 415-417; 426; 508; 503; 497; 492 of 662).  Consequently, Dr. Christian's October 6, 2009 opinion was entitled to be afforded controlling weight so long as it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and not otherwise

---

[24]  A cover letter included with exhibit 13F, dated August 24, 2009, and addressed to Nord Rehabilitation Center requested Plaintiff's provider to supply medical information for a disability reconsideration claim.  In the spaces provided on the letter is Dr. Christian's signature, a date of October 6, 2009, and provides her dates of treatment beginning February 17, 2009 through September 29, 2009.  Instructions included at the bottom of the letter request the provider to return to the agency the "Entire Packet (this page with signatures, questionnaire, & invoice) to Ensure Payment" (Docket No. 12, p. 510 of 662).  The next two pages immediately after the signed cover letter is a completed questionnaire (Docket No. 12, pp. 511-512 of 662).  A duplicate copy of the completed questionnaire is also included in the record as part of exhibit 12F, but is attached to a document invoice that is also dated August 24, 2009, which instructs the provider to include the form with the medical records provided to the Agency so that the provider may be compensated for the records (Docket No. 12, pp. 487 of 662).  The Court takes judicial notice of the fact that this is the invoice referred to in the signed cover letter in exhibit 13F and is among one of the forms referenced as being part of the "packet" to be returned to the agency (Docket No. 12, p. 510 of 662).

"inconsistent with the other substantial evidence in the case record." *See Hensley,* 573 F.3d at 266 (quoting *Wilson,* 378 F.3d at 548).

If the ALJ determined that Dr. Christian's opinions were neither well-supported nor consistent with the other medical evidence of the record, then ALJ Andreas was obligated to provide good reasons for whatever weight he chose to afford Dr. Christian's opinions. *See Allums v. Comm'r of Soc. Sec.*, 975 F.Supp.2d 823, 828-29 (N.D. Ohio 2013)(citing *Wilson*, 378 F.3d at 541). The ALJ's reasoning must be such that it permits "meaningful review" by this Court of his application of the treating physician rule. *Wilson*, 378 F.3d at 544.

Since the ALJ failed to consider all of the relevant medical and opinion evidence from Dr. Christian, the undersigned Magistrate finds the ALJ's decision is not supported by substantial evidence.

## 2.    DR. SMITH'S OPINION

In Plaintiff's second assignment of error, she alleges that the ALJ erred in discounting the opinion of Dr. Ronald G. Smith, consultative examiner, and argues that the ALJ failed to provide adequate reasons for discounting his opinion (Docket No. 17, pp. 18-19 of 20). Plaintiff asserts that the Agency's consultative examiners are "highly qualified" and "experts" in evaluating disability cases and that the ALJ is required to "explain" any rejection of these opinions (Docket No. 17, pp. 18-19 of 20). Plaintiff argues that the ALJ used a "blanket rationale" for discounting Dr. Smith's opinions, which is essentially inadequate (Docket No. 17, p. 19 of 20).

Although the regulations recognize that State agency medical or psychological consultants and other program physicians or psychologist are "highly qualified" and "experts" in social security disability evaluation, the ALJ is not bound by their findings. *See* 20 C.F.R. § 416.927(e)(2)(i) (West 2014). All the ALJ is required to do is consider the State agency's medical and psychological source opinions using the relevant factors found in §§ 416.927(a)-(d), including the medical speciality of the source of the opinion, expertise, supporting evidence in the case record, supporting explanations for the opinion, and any other relevant factors for assessing the

evidence. *See* 20 C.F.R. § 416.927(e) (West 2014). Unlike the "good reason" requirement for discounting the opinion of a treating source, there is no requirement that the ALJ expressly note his findings for each of the factors set forth in §§ 416.927(a)-(d), instead the ALJ must simply explain the weight given such an opinion after having considered the relevant factors. *See* 20 C.F.R. § 416.927(e)(2)(i) (West 2014); SSR 96-6P, 1996 WL 374180 (July 2, 1996) (West 2014).

In his decision, ALJ Andreas summarized Dr. Semmelman's findings, which included her observations that Plaintiff's reports to her consultative examiners and treating sources were inconsistent with each other and other treatment records concerning her weight, substance abuse and hallucinations (Docket No. 12, p. 36 of 662). After summarizing Dr. Smith's findings, the ALJ concluded that Dr. Smith's opinion was worthy of little weight because it contains speculation, is based upon inconsistent information, and is generally inconsistent with the evidence of the record (Docket No. 12, p. 37 of 662). The ALJ's analysis of Dr. Smith's findings reflects his consideration of the requisite 20 C.F.R. § 416.927(c) factors. By characterizing Dr. Smith's findings as speculative, and inconsistent, ALJ Andreas has addressed both the supportability and consistency factors set forth in 20 C.F.R. § 416.927(c).

Accordingly, the undersigned Magistrate finds that the ALJ's findings with respect to Dr. Smith are supported by substantial evidence.

### 3. VE TESTIMONY

Although not discussed by the parties, the Court notes an apparent inconsistency in the VE's testimony. When asked by the ALJ to describe Plaintiff's past work, the VE included the position of kitchen helper, DOT 318.687-010 (Docket No. 12, p. 79 of 662). In response to the ALJ's first hypothetical question, the VE testified that Plaintiff would be unable to perform any of her past work, but then provided examples of other work Plaintiff was capable of performing and included the job of kitchen helper, DOT 318.687-010 (Docket No. 12, pp. 81-82 of 662). On remand, the Commissioner should address this inconsistency in the VE's testimony.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate reverses the Commissioner's decision and remands this case, pursuant to the fourth sentence of 42 U.S.C. § 405(g), for further proceedings consistent with this decision.  On remand, the Commissioner should reassess disability based on the assessment of Dr. Christian's opinions and address the VE's inconsistent testimony.


**IT IS SO ORDERED**.

/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   October 31, 2014